In the Matter of SOUTHERN LAND TI-
TLE CORPORATION, Debtor, In Pro-
ceedings for the Reorganization of a
Corporation.

In re Southern Land Title Corporation
and the Five Flags Building, Inc.

No. 67–135.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Sept. 9, 1970.

See also D.C., 310 F.Supp. 450.

John Pat Little, Charles Schwartz, Jr., Little, Schwartz & Dussom, New Orleans, La., for Albert J. Ward, Jr., Trustee.

James J. Morrison, New Orleans, La., for debtor corporation.

Clem H. Sehrt, Peter J. Butler, Sehrt, Boyle, Wheeler & Butler, Moise S. Steeg, Jr., Steeg & Shushan, New Orleans, La., for 225 Baronne Street, Inc., and the National American Bank.

Cicero C. Sessions, Sessions, Fishman, Rosenson, Snellings & Boisfontaine, New Orleans, La., for Leonard R. Spangenberg, Jr.

Harry T. Howard, III, Chaffe, McCall, Phillips, Burke, Toler & Sarpy, New Orleans, La., for Dr. Francis E. LeJeune.

HEEBE, District Judge:

This is a reclamation suit by the trustee, Albert J. Ward, Jr., and certain debtor corporations herein against 225 Baronne Street, Inc., for the return of the building generally known as "225 Baronne Building" to the Five Flags Building, Inc. (one of the debtor corporations), and the return of the land on which the building is situated to Southern Land Title Corporation (another debtor corporation). By means of this same suit Mr. Ward, acting as trustee for Plaza Towers, Inc., another debtor corporation, was seeking reclamation of another piece of property in downtown New Orleans, commonly referred to as the "Goldberg Tract." We do not have to pass upon the reclamation of the Goldberg Tract because the defendant, 225 Baronne Street, Inc., has agreed to reconvey that property to the trustee under a consent judgment upon payment to the defendant of its investment.

We, therefore, focus our attention on the testimony and documents which relate to the attempts to reclaim the land and building located at 225 Baronne Street in the City of New Orleans.

On May 3, 1968, James J. Morrison, attorney for the debtor corporations herein, filed a document entitled, "Further objections to proposed disclaimers." Subsequently, on May 6, 1968, Mr. Morrison filed a document entitled, "Memorandum in opposition to disclaimers and adjudication in bankruptcy." Shortly after the above two documents were filed, the trustee filed a petition for the examination of designated persons under §§ 21 and 167 of the Bankruptcy Act (11 U.S.C. §§ 44 and 567). The trustee's pe-

tition was set for hearing on May 23, 1968, at which time Mr. Morrison and Mr. Sam J. Recile testified. At the beginning of the hearing on May 24, 1968, Mr. Cicero C. Sessions addressed two questions to Mr. Morrison which helped to clarify the purpose behind Mr. Morrison's pleadings and eventually led to the present reclamation suit.[1] After the exchange between Mr. Sessions and Mr. Morrison, it was perfectly clear to all the parties at interest herein what the purpose of Mr. Morrison's pleadings were, and at that point Mr. Sessions moved to terminate the hearing (see footnote 1, *supra*). The motion by Mr. Sessions to terminate the proceedings was denied. It was stipulated and agreed by counsel for the debtor corporations, for 225 Baronne Street, Inc., and the trustee that the Court could try the question of whether or not title to 225 Baronne Street should be reclaimed by the trustee.

Mr. Sessions moved that the proceedings of May 23, 1968, be excluded from the record of the present proceedings except to the extent that it be considered in light of a deposition. That motion was granted.

When we began hearing testimony on the morning of May 24, 1968, the case was in the following posture. The hearing on the petition of the trustee to examine designated persons under §§ 21 and 167 of the Bankruptcy Act (11 U.S.C. §§ 44 and 567) had been converted into a summary-plenary hearing on reclamation of title to the land and building known as the 225 Baronne Building and title to the Goldberg Tract under §§ 67d(2) and 70 of the Bankruptcy Act (11 U.S.C. §§

1. The following is an exchange between Mr. Sessions and Mr. Morrison on May 24, 1968:

"Mr. Sessions: * * * Now, is his [Morrison's] pleading intended to seek to have the Trustee file the reclamation suit on the 225 Baronne Building or is it, (b) to the contrary, an attack upon past acts or failure to act on the part of the Trustee?

"I think, for the purposes of Rule 16, a statement by Mr. Morrison as to what his real intentions are—and I find these pleadings somewhat ambiguous in that respect—will be very helpful to the Court in narrowing and identifying the issues of this case.

"Mr. Morrison: If your Honor please, I have no hesitancy in answering Mr. Sessions' questions.

"My *sole purpose* in this whole thing is simply to have a reclamation of that building for the benefit of the creditors. I have no interest in the fact that the Trustee or the attorney for the Trustee, or vel non—I haven't the slightest interest in—" (Tr. pp. 3–4)

"Mr. Sessions: I will ask Mr. Morrison this: What is the purpose * * * and is it a fact or not that the purpose of your pleadings which instigated or triggered the Trustee's petition for this hearing, is to try to induce by the Trustee along the lines of filing a reclamation suit of the building 225 Baronne?

"Or is it an attack upon the Trustee's alleged negligence or failure to act in the past in that or any other respect?

"Mr. Morrison: It is not an attack upon the Trustee in any way whatsoever except to point out that he has not done this in the past and that it should be done at this present time.

"Mr. Sessions: Is there any action that you want the Court to take about inaction of the Trustee in the past, or is this action only prospectively in the future?

"Mr. Morrison: Absolutely nothing about anything in the past; I simply want, as Mr. Sehrt has stated that he wants, the question of the validity of the 225 Baronne Street transaction aired, brought to the full attention of the Court and determined.

"Mr. Sessions: In that circumstance, Your Honor, I suggest to the Court that this hearing is not the proper vehicle for there to be a name-calling contest, or for there to be evidence, even contradictory evidence on the validity of the sale of 225 Baronne Street, vel non, and it is completely beyond the purposes of this hearing.

"And I further suggest to the Court that Mr. Morrison's judicial admission, direction and statement in answer to my question is tantamount to Rule 15 amendment of his pleadings, and that the basis for the Trustee's pleadings for this hearing has now completely collapsed, and I move that the hearing be terminated." (Tr. pp. 8–10)

107d(2) and 110), just as if a plenary suit had been filed by the trustee; the findings of the Court were to be dispositive of the issues involved in the reclamation proceedings and the results at the conclusion of the hearing would be binding on all parties at interest.

The Court heard testimony on May 24, 25, 26, 27, and October 21, 22, and 24, 1968. The hearing was then continued pending the results of compromise negotiations. The hearing resumed on April 21, 23, 24, May 14, 15, and June 4, 5, and 6, 1970. The matter was taken under submission on July 1, 1970, when all parties were supposed to file their proposed findings of fact and conclusions of law.

■ Section 67 d(2) of the Bankruptcy Act (11 U.S.C. § 107 d(2)) provides:

"(2) Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent; or (b) as to then existing creditors and as to other persons who become creditors during the continuance of a business or transaction, if made or incurred without fair consideration by a debtor who is engaged or is about to engage in such business or transaction, for which the property remaining in his hands is an unreasonably small capital, without regard to his actual intent; or (c) as to then existing and future creditors, if made or incurred without fair con-

sideration by a debtor who intends to incur or believes that he will incur debts beyond his ability to pay as they mature; or (d) as to then existing and future creditors, if made or incurred with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors." [2]

That section of the Bankruptcy Act sets out four situations in which a transfer is fraudulent. The first three situations, from which fraud is conclusively presumed, regardless of actual intent, have one common prerequisite of an absence of "fair consideration" to the debtor in return for his conveyance.[3] Lack of proof that there was an absence of "fair consideration" is fatal to the presumption raised by the first three subsections of § 67 d(2). See, In Re Quaker Room, 90 F.Supp. 758 (S.D.Cal.1950); Nicholson v. Scott, 50 F.Supp. 209 (E.D.Mich. 1943); and Matter of Roark, 28 F.Supp. 515 (E.D.Ky.1939).

In Cohen v. Sutherland, 257 F.2d 737 (2d Cir. 1958), the court stated at 742:

"The 'fair consideration,' absence of which brings into operation the first three clauses of § 107, sub. d(2), is not merely the good and valuable consideration necessary to sustain a simple contract. See Cole v. Loma Plastics, Inc., D.C.N.D.Tex.1953, 112 F.Supp. 138, 141. As defined in 11 U.S.C.A. § 107, sub. d(1), 'consideration given for the property or obligation of a debtor is "fair" (1), when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied. * * *' 'Fair consideration' requires both a *fair equivalent* and *good*

2. Section 67 d(2) of the Bankruptcy Act is the federal codification of the Uniform Fraudulent Conveyance Act.

3. Section 67 d(1)(e) of the Bankruptcy Act, 11 U.S.C. § 107 d(1), defines the term "fair consideration" as used in § 67 d(2) as follows:
 "* * * (e) consideration given for the property or obligation of a debtor

is 'fair' (1) when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied, or (2) when such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained."

*faith.* See In Re Messenger, D.C.E.D. Pa.1940, 32 F.Supp. 490, 494." (emphasis added)

The first issue we must resolve in determining whether or not 225 Baronne Street, Inc., paid a fair consideration for the property in question is whether the amount paid was a *fair* equivalent for the property conveyed. On December 17, 1964, The Five Flags Building, Inc., acquired title to the 225 Baronne Building for $11,658,824.68 from Allen Towers, Inc. (See R–1). On April 8, 1965, Southern Land Title Corporation acquired the land under said building for $1,460,000.00 from Lange W. Allen and Carl O. Kingsbury (see R–2 and R–3). The total consideration paid by The Five Flags Building, Inc., and Southern Land Title Corporation for the 225 Baronne Building and the land thereunder was $13,-118,824.64. The net funds loaned to The Five Flags Building, Inc., in December of 1964 amounted to $14,743,276.22.[4]

225 Baronne Street, Inc., paid $15,-750,000.00 for the 225 Baronne Building and the land thereunder on September 21, 1966[5] (see Henican 2). The consideration was paid in accordance with exhibit "Boyle 1" (the amended statement of October 19, 1966). Over and above this, 225 Baronne Street, Inc., paid the additional sum of $256,457.05 to National American Bank for the credit of The

---

4. Schedule explaining net funds loaned to The Five Flags Building, Inc.

ACQUISITION OF 225 BARONNE BUILDING
BY THE FIVE FLAGS BUILDING, INC.,
ON DECEMBER 17, 1964

Purchase Price:

| | |
|---|---|
| $ 8,444,276.22 | Metropolitan Mortgage Assumed |
| 2,149,000.00 | John Mack note |
| 2,250,000.00 | John Mack cash |
| $12,843,276.22 | Sub-Total (Refer to Exhibit R–1) Less cash & securities |
| —1,184,451.54 | held in escrow by the Continental Ill. National Bank and later released to purchaser. (Refer to Courville Exhibits 9–10–11) |
| $11,658,824.68 | Total consideration paid for building (On April 8, 1965, Southern Land Title Corporation acquired land under building for $1,460,000.00; Thus total cost of building and land amounted to $13,118,824.64) (Refer to Exhibits R–2; R–3) |

Funds Loaned:

(Refer to Frank Spalitta's testimony on the afternoon of October 21, 1968)

| | | |
|---|---|---|
| By: National American Bank | $ 2,350,000.00 | |
| By: Universal Drilling Company | 250,000.00 | |
| By: Gulf Natural Gas Company | 400,000.00 | |
| By: Republic Petroleum Corporation | 150,000.00 | |
| By: Louis J. Roussel | 200,000.00 | |
| By: Metropolitan | 8,444,276.22 | |
| By: John Mack (note) | 2,149,000.00 | |
| By: Cash & Securities | 1,184,451.54 | (See above) |
| By: Philip E. James | 300,000.00 | |
| By: Sotan, Inc. | 300,000.00 | |
| By: Plaza Towers, Inc. | 200,000.00 | |
| | $15,927,727.76 | |
| Cash & Securities | —1,184,451.54 | (See above) |
| Net funds loaned to Five Flags Building, Inc. in December 1964 | $14,743,276.22 | |

---

5. The transfer at issue here which is dated September 21, 1966 was within the one year limitation of the Bankruptcy Act, being less than five months prior to the filing of these bankruptcy proceedings.

Five Flags Building, Inc. These funds represented the credit received by 225 Baronne Street, Inc., on its purchase of the second mortgage owned by Talcott, Inc., which encumbered the subject properties (see Courville 1, 2 and 3).

██ Three appraisal reports were admitted into evidence (subject to objections as to relevancy) with reference to the subject property. Kuebel 1, dated September 8, 1959 (prior to the construction of the building) valued the land and building at $13,600,000.00. Canizaro 1 was dated August 11, 1966 (within 45 days of the subject transfer) and valued the land and building at $16,-000,000.00 Stallings 1, dated October 26, 1967 (more than one year after the subject transfer) valued the land and building at $17,800,000.00. Based upon the entire record in these proceedings, we find that 225 Baronne Street, Inc., paid a *fair equivalent* for the 225 Baronne Building and the land thereunder on September 21, 1966.

The second issue in finding a fair consideration is whether or not the defendant acted in good faith at the time of the transfer. In determining good faith, we must consider the actions of the parties on or before September 21, 1966 (the date of the transfer in this case) and not any subsequent actions. Of course, in any determination of good or bad faith, the subjective intent and purpose of the parties is the critical factor. We must rely upon the testimony of the witnesses and the documentary evidence surrounding their actions at the time in question in determining the intent and purpose of the parties.

No officer or director of 225 Baronne Street, Inc., was furnished with a financial statement of The Five Flags Building, Inc., or its parent, Southern Land Title Corporation, which would have reflected their financial condition in 1966. The evidence shows that no such statement was available, even to the officers and directors of the debtor corporations. (See James testimony, Tr. 949.)

In August of 1966, Mr. Henican and Mr. James were of the opinion that the rental income from the 225 Baronne Building was being diverted to other entities (Tr. 665, 929–930), and that this was recognized to be a major factor in the default by The Five Flags Building, Inc., with reference to its second and third mortgages encumbering the subject property. While this was known by 225 Baronne Street, Inc., it was not known that The Five Flags Building, Inc., and its parent corporation, Southern Land Title Corporation, were insolvent. C. Ellis Henican, who took over as President of Southern Land in August of 1966, was of the opinion that the various debtor corporations could be rehabilitated and that the proper way to accomplish this was to sell as much of the assets as possible in order to reduce the debt. This opinion was transmitted to National American Bank and 225 Baronne Street, Inc. (See James 1 and H-3.) Exhibits H-1, H-3, H-4, Henican 1 and Sehrt 114, which are letters written by C. Ellis Henican to either Louis J. Roussel, Clem H. Sehrt or Sam J. Recile, are helpful in showing the intent and purpose of the parties surrounding this transfer.

Based upon all of the evidence, we find that 225 Baronne Street, Inc., was a good faith purchaser of the subject property. Therefore, since the property was acquired for a fair equivalent and in good faith, the transfer in question was made with "fair consideration," and the first three situations (a), (b) and (c) of § 67 d(2) are not applicable to the instant case.

We turn to a consideration of § 67 d (2) (d) of the Bankruptcy Act because the trustee argues that even if the consideration was fair, there was actual intent "to hinder, delay, or defraud" creditors and the transfer should be set aside under that section. In determining whether or not § 67 d(2) (d) is applicable to the instant case, we must decide whether there was a fraudulent intent first, on the part of the bankrupt, and

then, on the part of the defendant, 225 Baronne Street, Inc. If we would find a fraudulent intent under § 67 d(2) (d) on the part of either the bankrupt or the defendant, we would then reach the issue of whether the defendant is entitled to the protection of § 67 d(2) (6).

Was there fraudulent intent within the meaning of § 67 d(2) (d) on the part of The Five Flags Building, Inc., or Southern Land Title Corporation? The burden of proof that the transfer in question was fraudulent rests on the trustee. (See 4 Collier on Bankruptcy, 14th Ed., Sec. 67.43.) The question of actual intent under § 67 d(2) (d) is purely factual.

After carefully examining all of the evidence, we find that the bankrupt corporations entered into the sale in question for the purpose of attempting to continue in business and to try to rehabilitate themselves financially. Mr. Recile and Mr. Spalitta had created a financial nightmare, and when Mr. Henican was pressed into service, it was his opinion that the only way to possibly revitalize these corporations would be to sell some of the assets in order to reduce their indebtedness. (See testimony of James and Henican.)

C. Ellis Henican, the President and a Director of Southern Land Title Corporation and the Vice-President and a Director of The Five Flags Building, Inc., stated that it was in the best interests of Southern Land Title Corporation to sell as much of its properties as possible in order to reduce its indebtedness. (See August 30, 1966 Memo of Henican, exhibit James 1.). The August 30, 1966 Memo of C. Ellis Henican was written approximately three weeks prior to the sale of the subject properties, and at a time when this reclamation proceeding was completely unexpected. Neither Philip E. James (President of The Five Flags Building, Inc.) nor C. Ellis Henican, who were the motivating principals in September of 1966, with reference to Southern Land Title Corporation and The Five Flags Building, Inc., voted to sell the subject land and building to 225

Baronne Street, Inc., "to deliberately defeat other creditors of The Five Flags Building, Inc., and for the sole purpose of preferring the National American Bank and Mr. Roussel and associates to the detriment of the other creditors." (Tr. pp. 703, 950–952.)

After the properties in question were transferred, C. Ellis Henican, by letter dated September 28, 1966, addressed to Louis Roussel and associates, requested that Roussel form another group to purchase the Plaza Towers building (See H-3). We find the sale of the property involved herein on September 21, 1966, to be consistent with the ideas of Henican which he expressed in his memo of August 30, 1966 (James 1) that it would be in the best interests of the debtor corporations to dispose of as much of the properties as possible in order to reduce the liabilities.

Two officers of the National American Bank were elected to the Board of Directors of The Five Flags Building, Inc., in August of 1966, to see that the rental income from the 225 Baronne Building would be applied to the debts of The Five Flags Building, Inc. There is absolutely no evidence in the record to indicate that these two men voted for the sale to hinder, delay or defraud either then or future creditors of The Five Flags Building, Inc., or to prefer National American Bank over other creditors of said Five Flags Building, Inc. To the contrary, although the Board of Directors of The Five Flags Building, Inc., consisted of five members, acting independently, Henican, by letter dated September 14, 1966, advised Louis J. Roussel and associates, that he, Philip E. James and Middleton Wootten, constituted a majority of the Board, and, regardless of the actions of the other two members, the Board would vote for the sale of said property (See Henican 1). The Act of Sale in question with reference to The Five Flags Building, Inc., was not passed pursuant to any vote of its Board of Directors, but was passed pursuant to a Unanimous Consent of its sole stockholder, Southern Land Title Corporation

(see Unanimous Consent of Southern Land Title Corporation attached to Act of Sale—Henican 2).

■ From all of the circumstances surrounding the transfer of September 21, 1966, we find that no fraudulent intent as contemplated by § 67 d(2) (d) existed on the part of either The Five Flags Building, Inc., or Southern Land Title Corporation.

Was there fraudulent intent within the meaning of § 67 d(2) (d) on the part of the defendant-transferee. We found, *supra*, that the defendant, 225 Baronne Street, Inc., was a bona fide purchaser for a present fair equivalent value. We further find that the record does not support a finding of actual fraudulent intent on the part of the defendant-transferee.

"Where the transferee or obligee is in a position to dominate or control the bankrupt's disposition of his property, however, his intent to hinder, delay, or defraud creditors would seem sufficient to render the transfer or obligation fraudulent within § 67 d (2) (d) without respect to the purpose of the bankrupt transferor." 4 Collier on Bankruptcy, 14th Ed. § 67.37, p. 533.

We find that the defendant-transferee was not in a position to dominate or control the bankrupt's disposition of his property, and assuming *arguendo* that it was in such a position, the transfer still could not be set aside because the intent to hinder, delay or defraud creditors is lacking. There is no doubt that the National American Bank was protecting its interest in the property involved and rightfully so; but a protection of its interest by the steps it took is far from approaching a fraudulent intent to hinder, delay or defraud other creditors.

The National American Bank held a valid third mortgage on the property in question on September 21, 1966. By letter dated December 8, 1964, addressed to Philip E. James as President of The Five Flags Building, Inc., Clem H. Sehrt,

then President of National American Bank, set forth the terms and conditions which The Five Flags Building, Inc., would have to satisfy in order to obtain a loan of $2,350,000.00 (See J-1). These conditions were accepted by Philip E. James (Tr. 928–929) and the loan was made on December 16, 1964.

In compliance with the requirements of the $2,350.000.00 loan (J-1), The Five Flags Building, Inc., pledged the Certificates of Deposit of $1,500,000.00. By a series of letters, culminating in April of 1965, Philip E. James, as President of The Five Flags Building, Inc., obtained the release of the entire proceeds of the Certificates of Deposit, accordingly reducing the security on the loan and dissipating the required compensating balances. These funds were credited to the checking account of The Five Flags Building, Inc., (See J-4 and Courville Exhibit 12).

When National American Bank, by letter dated February 1, 1966, demanded the payment of the remaining principal balance then due on the original $2,-350,000.00 note, said loan was in default, as the interest due thereon was seriously delinquent, and the non-interest-bearing Certificate of Deposit in the amount of $1,500,000.00 which was required under the December 8, 1964, agreement was never replaced (see R-9).

On April 13, 1966, the record reflects that there was still due and owing on the original $2,350,000.00 loan, a principal balance of $923,579.74 (see Courville Exhibit 4). On that date, the National American Bank increased its loan to The Five Flags Building, Inc., by lending to it the additional principal sum of $526,-420.26; this loan then reflected a principal balance due of $1,450,000.00. These additional funds were advanced pursuant to the conditions expressed in a letter dated April 15, 1966, written by Clem H. Sehrt, as President of the Bank, to Philip E. James, as President of The Five Flags Building, Inc., (see R-12). Both James and Henican thought that the conditions set forth in said letter were reasonable (see H-1; Tr. 933–934).

On June 1, 1966, the $1,450,000.00 loan was not paid. Pursuant to the letter of April 15, 1966 (R-12) and the understanding between Philip E. James, as President of The Five Flags Building, Inc., and Clem H. Sehrt, as President of National American Bank on April 13, 1966 (see also testimony of Clem H. Sehrt), a collateral mortgage in the amount of $1,450,000.00 dated June 17, 1966, was placed upon the subject properties and recorded on June 20, 1966 (see Exhibit R-13A).

The record reflects that The Five Flags Building, Inc., was unable to even pay the principal sum of $25,000.00 monthly, in partial satisfaction of the $1,450,000.00, pursuant to the agreement between the parties (see R-12; Tr. 875). In fact, the record reflects that as of September 21, 1966, the interest which The Five Flags Building, Inc., owed to the National American Bank with respect to its loan was delinquent from April 1, 1966, and that the $25,000.00 principal payments due for July, August and September of 1966 were also delinquent (see Courville Exhibit 7; Tr. 444–446.[6]

---

6. The following are schedules which summarize portions of the testimony and exhibits concerning the financial transactions at issue in this case.

### A
#### RECEIPT AND DISBURSEMENT OF ESCROW FUNDS WHICH WERE FORMERLY HELD FOR ACCOUNT OF METROPOLITAN LIFE INSURANCE CO. ON JULY 12–13, 1965
(Refer to Courville Exhibits 9–10–11)

$1,184,451.54 Funds Received for Disbursement by National American Bank of New Orleans

Funds Disbursed by National American Bank:

$ 881,451.54 Applied as follows:
$855,568.89 Payment on Loan of The Five Flags Building, Inc.
25,882.65 Applied to interest due on The Five Flags Bldg., Inc. loan

20,000.00 To pay joint loan of C. Ellis Henican, Philip E. James, Sam J. Recile and Frank Spalitta

283,000.00 Credited to the following accounts:
$ 24,000.00 Sam Recile
57,000.00 Southern Land Title Corp.
8,500.00 Sotan, Inc.
2,500.00 Barbara Recile
15,000.00 G. Brian Corporation
10,000.00 The Five Flags Building, Inc.
109,000.00 Standard Mortgage Corp.
57,000.00 Sam J. Recile (Merchants Bank)

$1,184,451.54 TOTAL DISBURSEMENT

### B
#### DISBURSEMENT OF PROCEEDS OF LOAN TO THE FIVE FLAGS BUILDING, INC. ON APRIL 13, 1966 IN AMOUNT OF $1,450,000.00
(Refer to Courville Exhibits 18–18A–18B–18C)

$ 923,579.74 To pay old loan in full of The Five Flags Building, Inc. in original amount of $2,350,000.00
23,250.00 Credited to checking account of Sam Recile
6,572.20 To pay interest on loan of C. Ellis Henican
6,572.20 To pay interest on loan of Philip James
35,600.00 Credited to the checking account of Plaza Towers, Inc.
8,000.00 Credited to the checking account of Philip E. James
30,600.00 Interest due on the loan of Five Flags Building, Inc.
415,825.86 Credited to the checking account of G. Brian Corporation

$1,450,000.00 TOTAL DISBURSEMENT

## C

### DISPOSITION OF $1,250,000.00 CERTIFICATE OF DEPOSIT PURCHASED FROM NATIONAL AMERICAN BANK ON DECEMBER 16, 1964

(Refer to Courville Exhibit 12)

| | |
|---|---|
| $ 150,000.00—January 29, 1965 | Credited to The Five Flags Building, Inc. Checking account at National American Bank |
| 125,000.00—March 25, 1965 | Credited to The Five Flags Building, Inc. Checking account at National American Bank |
| 975,000.00—April 28, 1965 | Credited to The Five Flags Building, Inc. checking account at National American Bank |

$1,250,000.00

### DISPOSITION OF $250,000.00 CERTIFICATE OF DEPOSIT PURCHASED FROM MERCHANTS TRUST AND SAVINGS BANK ON DECEMBER 16, 1964

| | |
|---|---|
| $ 250,000.00—April 28, 1965 | Credited to The Five Flags Building, Inc., checking account by National American Bank, per instructions of Merchants Trust & Savings Bank |

## D

### FUNDS RECEIVED BY NATIONAL AMERICAN BANK FOR DISBURSEMENT ON AUGUST 13 and 16, 1965

(Refer to Courville Exhibits 14–14A–14B)

FUNDS RECEIVED:

$1,046,021.07—Proceeds of Talcott loan
154,989.26—Proceeds of Metropolitan loan
76,529.77—Proceeds of Mart "51" sale
12,257.85—Refund of Standard Mortgage Corporation
2,500,000.00—Proceeds of Sotan, Inc., loan

$3,789,797.95—TOTAL FUNDS RECEIVED

FUNDS DISBURSED:

(Refer to Courville Exhibits 15–15A–15B–15C–15D–15E)

$ 601,923.95—Pay loans of Southern Land Title Corporation
132,500.00—Credited to account of M. Sternberg
217,047.56—Credited to Merchants Bank to pay the following:
 $161,140.86—Loan of Sotan, Inc.
 28,400.00—Loan of Southern Land Title Corp.
 25,000.00—Loan of Sam J. Recile
 1,892.92—N.S.F. check
 613.78—Interest on the above loans
388,598.82—To pay the following loans and interest on same
 $ 93,000.00—Loan of Philip E. James,
 Int.—$124.00
 121,500.00—Joint loan of C.E.H., P.E.J., S.J.R. & F.S.
 Int.—$548.44
 27,741.00—Joint loan of C.E.H., P.E.J., S.J.R. & F.S.
 Int.—$175.31
 50,000.00—Loan of Sam J. Recile
 25,000.00—Loan of G. Brian Corporation
 Int.—$252.78
 25,000.00—Loan of Barbara Recile
 Int.—$257.29
 10,000.00—Part payment on $100,000.00 loan of Barbara Recile
 25,000.00—Loan of C. Ellis Henican, Jr.
 10,000.00—Joint loan of C. Ellis Henican and Sam J. Recile
85,000.00—To Purchase:
 $ 60,000.00—Cashier's check to Lomas & Nettleton Financial Corp.
 25,000.00—Cashier's check to Hurd & Co., New York

210,000.00—To Credit the following accounts:

$ 40,000.00—G. Brian Corporation
50,000.00—Sam J. Recile
10,000.00—Sotan, Inc.
35,000.00—The Five Flags Buildings, Inc.
45,000.00—Plaza Towers
15,000.00—G. Brian Corporation, Payroll
5,000.00—Leonard Spangenberg
7,000.00—Frank Spalitta
3,000.00—Barbara Recile

563,535.40—To Purchase:

$297,269.46—Cashier's check to Hibernia Bank
21,856.62—Cashier's check to Hibernia Bank
244,409.32—Cashier's check to National Bank of Commerce

$ 100,000.00—To Credit the account of G. Brian Corporation
455,000.00—To Purchase Cashier's check to H & H Constr. Corp.
178,475.00—To Purchase the following Cashier's checks:

$ 10,000.00—Check, Philip E. James
15,975.00—Check, Title Ins. Co. of St. Louis
1,000.00—Check, Sehrt, Boyle & Wheeler
30,000.00—Check, Empire Land Corporation
25,000.00—Check, Louis J. Roussel
96,500.00—Universal Drilling Co., Inc.

247,735.03—Credited to account of G. Brian Corporation
1,981.18—To issue check to escrow real estate taxes on Sotan, Inc., land in Baton Rouge
100,000.00—To Credit the following accounts:

$ 50,000.00—G. Brian Corporation
50,000.00—The Five Flags Building, Inc.

100,738.10—Transferred to Real Estate Department of National American Bank to be escrowed for the completion of Southern Land Title Corporation jobs in progress
7,262.91—To Pay interest on following loans:

$ 3,520.83—Sotan loan through August 13, 1965
3,520.76—Southern Land Title Corporation loan through August 13, 1965
221.32—Southern Land Title Corporation loan through August 13, 1965

400,000.00—Credited to loan of The Five Flags Building, Inc.

$3,789,797.95—TOTAL DISBURSEMENT

E

SUMMARY OF LOAN ACCOUNT WITH NATIONAL AMERICAN BANK
FOR THE FIVE FLAGS BUILDING, INC.
RE: $2,350,000.00 LOAN OF DECEMBER 16, 1964
REFLECTING ALL PAYMENTS, RENEWALS AND INCREASES

(Refer to Courville Exhibit 4)

| DATE | LOANS MADE | PAYMENTS MADE | BALANCE |
|---|---|---|---|
| 12/16/64 | $2,350,000.00 | $ –0– | $2,350,000.00 |
| 4/28/65 | 2,350,000.00 (Renewed) | –0– | 2,350,000.00 |
| 7/13/65 | | 740,568.89 | 1,609,431.11 |
| 8/18/65 | | 400,000.00 | 1,209,431.11 |
| 1/7/66 | | 35,851.37 | 1,173,579.74 |
| 2/18/66 | | 250,000.00 | 923,579.74 |
| 4/13/66 | | 923.579.74 | –0– |
| 4/13/66 | 1,450,000.00 | –0– | 1,450,000.00 |
| 6/17/66 | 1,450,000.00 (Renewed) | –0– | 1,450,000.00 |
| 9/21/66 | | 893,832.66 | 556,167.34 |
| 11/18/66 | 189,972.31 | | 746,139.65 |
| 12/5/66 | 83,383.24 | | 829,522.89 |
| 12/30/66 | 104,194.08 | | 933,716.97* |

* Balance transferred to account of C. Ellis Henican on April 20, 1967.

The record reflects that if Jennings L. Courville, while employed as an officer of National American Bank, was guilty of any wrongdoing by accepting money or other things of value from Southern Land Title Corporation, or any of its related corporations, his acceptance of such items of value could not possibly have any effect on the issues before this Court, as at all times pertinent his authority was insignificant, and his only task was to implement decisions already made by the Board of Directors and/or the management of the National American Bank (see testimony of Clem H. Sehrt).

Furthermore, if the said Jennings L. Courville did accept cash or other items of value from Southern Land Title Corporation, or its related corporations, without performing legitimate services in consideration therefore, then he became an agent for Southern Land Title Corporation, or for whatever related corporation which gave him such items of value; any wrongdoing on his part would be attributable to the paying corporation and not to the Bank. The testimony clearly reflects that Frank J. Spalitta never did tell any officer of the Bank of the monies or other gratuities which the debtor corporations paid to Courville. The Court cannot accept the reasons which Spalitta gave for his silence (see Deposition of Frank Spalitta taken in this proceeding on April 20, 21, 1970, pp. 63–71).

With respect to the so-called "over-line" loan situation which temporarily existed between the National American Bank and Southern Land Title Corporation, the testimony reflects that this situation was caused by mergers between said Southern Land Title Corporation and certain of its subsidiaries, completely independent of any action or knowledge by said Bank (see testimony of Henican; Tr. 657–663; see also testimony of Sehrt). Furthermore, this situation existed only for a very limited period of time and was corrected in August of 1965, less than sixty (60) days after it was first brought to the attention of the Bank (see testimony of Sehrt; see also two letters addressed by National American Bank to W. A. Robson, Regional Comptroller of the Currency, under dates of August 14 and August 17, 1965). Furthermore, this so-called "over-line" was completely incidental to, and unrelated with, the issues before this Court (particularly since it was corrected in August of 1965).

The record reflects that on September 21, 1966, the National American Bank held a valid third mortgage encumbering the subject properties; that The Five Flags Building, Inc., had defaulted not only with respect to this mortgage, but also with respect to the second mortgage held by Talcott, Inc., which encumbered these same properties. The record further reflects that these defaults were in no manner, shape or form caused by any illegal, immoral or fraudulent actions on behalf of the National American Bank, its officers or directors (C. Ellis Heni-

**F**

SUMMARY OF ALL OTHER LOANS MADE TO
THE FIVE FLAGS BUILDING, INC.
BY NATIONAL AMERICAN BANK

(Refer to Courville Exhibit 4)

| DATE | LOANS MADE | PAYMENTS MADE | BALANCE |
|------|-----------|---------------|---------|
| 3/16/65 | $395,896.06 | $ | $395,896.06 |
| 4/28/65 | | 395,896.06 | –0– |
| 4/9/65 | 115,000.00 | | 115,000.00 |
| 7/13/65 | | 115,000.00 | –0– |
| 4/26/65 | 185,000.00 | | 185,000.00 |
| 5/14/65 | | 185,000.00 | –0– |

can admitted that he personally knew of no such actions; Tr. 694–697).

Having found that none of the provisions of § 67d (2) are applicable to the instant suit, the Clerk is hereby directed to enter an order dismissing the instant reclamation proceeding.