**William H. BROWN, Trustee of Walter Hillman Achord and Hazel Inez Womack Achord in Bankruptcy**

**v.**

**Samuel L. WOMACK et al.**

**Civ. A. No. 71-387.**

United States District Court,
M. D. Louisiana.

Aug. 27, 1973.

Cordell H. Haymon, Baton Rouge, La., for plaintiff.

Roger M. Fritchie, Baton Rouge, La., for defendants.

E. GORDON WEST, District Judge:

This is a suit by the Trustee in Bankruptcy of Mr. and Mrs. Walter H. Achord seeking to set aside a sale of some 163 acres of land made by Mr. Achord to the defendants some five

months before the Achords filed a petition seeking to be adjudicated bankrupts. The Trustee seeks first to have the sale of the 163 acres declared null and void as a simulated sale. Secondly, the Trustee asserts that the sale was made in contravention of Article 1984 of the Louisiana Civil Code which provides:

> "Every contract shall be deemed to have been made in fraud of creditors, when the obligee knew that the obligor was in insolvent circumstances, and when such contract gives the obligee, if he be a creditor, any advantage over other creditors of the obligor."

For this reason, the Trustee contends that the sale should be held to be an absolute nullity and the property returned to the Trustee for the benefit of creditors. And finally, the Trustee contends that the sale should be set aside because it was made without "fair consideration," defined by Title 11, United States Code, Section 107(d)(1)(e) as "a fair equivalent."

After due consideration of all of the evidence adduced at the trial of this case, the Court concludes that there is far from a preponderance of evidence to the effect that this sale was in any way a simulation or that it was fraudulently made, or that the property was sold for an unfair or inadequate consideration.

The salient facts are not in dispute. Mr. Walter Hillman Achord acquired this 163 acres of land in 1940 and owned it until the time of the sale to the defendants in August of 1970. He built a home on it in 1966, and there are two or three other small residences on the property. Mr. Achord kept cattle on the property but his primary occupation was that of trucking, and more particularly, hauling sand and gravel. He commenced his sand and gravel hauling business in 1966 and was continuously engaged in it until the time of his bankruptcy in 1971. The first indication that Mr. Achord had that he was in financial difficulty was in December of 1970, one month before he filed his petition in bankruptcy in January of 1971. On August 25, 1969, one and one-half years before this serious financial difficulty arose, Mr. Achord sold an option to his brother-in-law, Mr. Sam Womack, a defendant herein, to purchase this 163 acres of land. He received $2,000 for this one year and 30 day option. The option, if exercised, provided for the sale of the property to Mr. Womack for a payment of $10,000 to be made by Mr. Womack upon exercising the option, and as further consideration, Mr. Womack was to assume all existing liabilities against the property, particularly a mortgage in favor of the Federal Land Bank for "approximately $75,000.00" and a "mortgage in favor of the Baton Rouge Production Credit Association for $6,900.00 not including interest." This option was exercised on August 14, 1970, well within the one year and 30 days allowed in the agreement. The sale price, according to the term of the sale, was $84,681.00, of which amount $10,000.00 was stated to have been paid in cash and the remainder, i. e., $74,681.00, was represented by Mr. Womack's assumption of the outstanding mortgage to the Federal Land Bank. Nothing was said in the act of sale about the $6,900.00 mortgage to the Baton Rouge Production Credit Association. The defendant introduced, over the objection of the plaintiff, evidence to show that Mr. Womack did in fact assume and actually pay the $6,900.00 mortgage in addition to the consideration stated in the sale. The evidence was objected to on the ground that under the provisions of Article 2236 of the Louisiana Civil Code:

> "The authentic act is full proof of the agreement contained in it, against the contracting parties, and their heirs or assigns, unless it be declared and proved a forgery." La.R.C.C. Art. 2236.

Since the plaintiff is contending that the consideration given for this sale was disproportionately low when compared to the actual value of the land, he insists that the defendant is bound by the consideration stated in the deed and may

not, by parol evidence, show that additional consideration was paid.

It is true that when an authentic act recites a consideration, parol evidence may not be used, in the absence of fraud, to show that *no* consideration was paid. McGee v. Finley, La.App., 65 So.2d 384. In other words, parol evidence may not be used in the absence of fraud to prove the *invalidity* of the transaction. But the same rule does not apply when the purpose of the evidence is to show the *validity* of the transaction. This distinction was expressed thusly in Wise v. Johnson, 241 So.2d 534 (La.App.—2nd Cir.—1970):

> "Parol evidence should not have been admitted to enable the plaintiff to prove that the conveyances under attack were simulations. * * * On the other hand, the defendant appellant, attempting to sustain and to maintain the validity of an authentic conveyance, does not violate the parol evidence rule by showing that the true consideration for the transfers * * * is different from that expressed in the instruments." At p. 536.

Thus, since the purpose of the parol evidence here was to show that a consideration larger than that stated in the deed was actually paid and since the purpose of showing this was to support the defendant's contention that the consideration paid was not disproportionately low compared to the value of the land, it is the opinion of this Court that that parol evidence was properly received. Taking that evidence into consideration, the Court concludes that the true consideration paid for this property by Mr. Womack, together with the other defendants who became co-owners of the property, was the sum of $91,581.00. This amount was represented by the assumption of the Federal Land Bank Mortgage in the sum of $74,681.00; the assumption of the Baton Rouge Production Credit Association mortgage in the sum of $6,900.00; and the cancellation of a $10,000.00 indebtedness owed by the plaintiff to Mr. Womack. The $2,000.00 paid for the option was not a part of the purchase price of the property. It was the cost of the option. Since there is no doubt but that a sizable consideration, i. e., $91,581.00, was paid for this property, there is no merit to plaintiff's contention that the sale was a simulation.

> "A simulated contract is one which, though clothed in concrete form, has no existence in fact and is only a myth. * * * It is the well settled jurisprudence of this state that when the actual consideration, no matter how inadequate, has been paid by the purchaser in an alleged sale, the transaction is not a simulated sale." Citizens Bank & Trust Co. v. Willis, 183 La. 127, 162 So. 822, 824 (1935).

Since it is obvious that the transaction here involved could not be considered as a simulated sale, it is necessary to determine whether or not the property was sold for a "fair consideration" which is defined in Title 11, United States Code, Section 107(d)(1)(e) as "a fair equivalent."

During the trial, evidence as to several appraisals of this property was introduced. Mr. Clifford C. Reddell, a qualified real estate appraiser, who deals primarily with rural and farm lands, appraised the property at $93,700.00 in November of 1970. That date was three months after the sale of the property to Mr. Womack, and some 15 months after the signing of the option in August of 1969. This appraisal took into consideration the fact that much of the property, particularly the portion fronting on Blackwater Road, is low and becomes inundated during moderate to heavy rainfall. It was necessary to build up the locations where the houses were built and to build up the roadway approaches to the houses so that there is ingress and egress during high water. Mr. Reddell appraised the improvements at $23,700.00 and the land at $70,000. He assigned a value of $350.00 per acre for about 90 acres of cut over land and $500.00 per acre for what he considered to be fair pasture land. It was his opin-

ion that the best use of this property is as farm or cattle raising property.

On the other end of the spectrum is the appraisal of Mr. Kermit Williams, called by the plaintiff as an expert appraiser. He placed a value of $172,929.-00 on this property which averages out to about $1,061.00 per acre, including improvements. He values the improvements at $33,844.00 and the land at $139,085.00. It was his opinion that this was the value as far back as August of 1969. He based his appraisal on what he considered to be sales of other comparable lands, and he considered its best use to be for residential subdivision purposes. But a comparison of the lands involved in those other sales shows without question of doubt that they are not true comparables. For most part his so-called comparables were much smaller tracts of land located on more highly developed roads. The only piece of property which he cited which was comparable in both size and location to the property under consideration was a tract containing 162 acres located about one-half mile away on Deerford Road. This is truly a comparable and it sold for about $450.00 per acre. Mr. Williams discarded this sale because he considered it a "distress sale" and not indicative of true value. It is the opinion of this Court that the evidence falls far short of indicating that $450.00 per acre was not the true value of that land.

In between these two appraisals were those of Mr. Albert McGee, a representative of the Federal Land Bank, and Mr. Gerald Phares, a representative of the Baton Rouge Production Credit Association. Mr. McGee stated that as of 1969 the Federal Land Bank had an outstanding loan of $77,900.00 on this property. He stated that at that time they could not loan over 65 per cent of "normal value" and he was not sure whether "normal value" was based on agricultural use or some higher use. At any rate, using this formula, his evaluation would be approximately $119,000.00. Mr. Phares testified that he had placed a "normal value," based not entirely on agricultur-

al use but on its best use, of $114,000.00 on this property. He further stated that he had been criticized by his superiors for having placed an excessive value on this property.

An initial study of these various appraisals leads to the conclusion that the value placed on the property by Mr. Williams is wholly unrealistic and that its true value lies somewhere between the sum of $93,700.00 placed on it by Mr. Reddell and the $119,000.00 value placed on it by Mr. McGee. A closer analysis tends to indicate that the $119,000.00 figure was based upon some use other than agricultural use and that the $114,000.00 appraisal made by Mr. Phares was, as indicated by his superiors, on the high side. This Court concludes that the value of this land as of the date of the option did not exceed $100,000.00. Based upon this finding it cannot be said that the $91,581.00 paid for it by Mr. Womack and the other defendants was not a "fair consideration" or a "fair equivalent" of its true value. And this Court's conclusion would be the same even if the evidence of the assumption by the defendants of the $6,900.00 mortgage to the Baton Rouge Production Credit Association had been excluded as requested by the plaintiff. See Epstein v. Goldstein, 107 F.2d 755 (CA2 —1939); In re Decker, 295 F.Supp. 501 (W.D.Va.—1969); In re Southern Land Title Corp., 316 F.Supp. 1059 (E.D.La. —1970).

Lastly, we must consider whether or not the sale of this land by Mr. Achord to the defendants was made in fraud of creditors. Article 1984 of the Louisiana Revised Civil Code provides:

> "Every contract shall be deemed to have been made in fraud of creditors, when the obligee knew that the obligor was in insolvent circumstances, and when such contract gives the obligee, if he be a creditor, any advantage over other creditors of the obligor."

To determine whether or not this sale was made in fraud of creditors we must look at the parties to the transaction not when the sale was consummated, but

when the binding option to purchase was granted on August 25, 1969. At about that time Mr. Achord received information that there were some very fine opportunities in the trucking business in San Antonio, Texas, and he decided to leave Louisiana and move his family to San Antonio. It was at that point that the option was granted. At that time he owned six gravel trucks and trailers. His son owned two such rigs and his son-in-law owned three. Subsequent to the signing of the option his son moved with his family to San Antonio and went into the hauling business there. Also, at about the same time, his son-in-law moved his family and his equipment to San Antonio. Shortly thereafter, Mr. Achord himself moved three of his six trucks to San Antonio and he lived there with his son and with his daughter in anticipation of moving his wife and the remainder of his equipment as soon as he could get established. This was his status at the time the option was exercised in August of 1970. Between the time that the option was signed and the time that it was exercised, Mr. Achord's activities would not seem to be those of a person who believed he was a bankrupt or even in serious financial difficulty. On December 19, 1969, he purchased two new trucks and successfully financed them in the sum of $10,852.00 with Mack Financial Corp. On February 19, 1970, he borrowed the sum of $37,780.00 from Associate Financial Services for the purchase of trucks. On June 24, 1970, he seemed to have no difficulty borrowing the sum of $5,000.00 from the Baker Bank and Trust Co. If these lending institutions, with whom Mr. Achord regularly did business, had no indication that Mr. Achord was in serious financial difficulty at that time, it would seem rather illogical to assume that the defendants had knowledge that Mr. Achord, if indeed he was, was in "insolvent circumstances." There was no credible evidence of any kind introduced in this case to indicate that at the time the option was signed, or indeed at the time that

the option was exercised, the obligee (Mr. Womack) knew that the obligor (Mr. Achord) was in insolvent circumstances. There is simply no evidence in this case to warrant the conclusion that this sale was made in fraud of the rights of creditors. As it turned out, it was probably made to the detriment of other creditors, but it was certainly not made in fraud of their rights. The preponderance of evidence in this case necessarily leads to the conclusion (1) that this was not a simulated sale; (2) that neither Mr. Achord nor any of the defendants knew or had reason to believe that Mr. Achord was in insolvent circumstances at the time of the granting of the option to purchase the land or at the time of its exercise; (3) that this sale was not made in fraud of creditors; and (4) that the price paid for this property was a "fair equivalent" of its true value.

For these reasons, there will be judgment entered herein in favor of the defendants, and against the plaintiff, dismissing this suit at plaintiff's cost.